FILED Rec'd
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y. 6/28/11 KM
★ JUN 27 2011 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JORGE VIDAL,

        Petitioner,

 -against-

DALE ARTUS, Superintendent,
Clinton Correctional Facility,

        Respondent.
------------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
08-CV-1956 (CBA)

**AMON, United States District Judge.**

INTRODUCTION

   Jorge Vidal ("Vidal"), *pro se*, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to vacate his convictions on one count of Murder in the Second Degree, one count of Criminal Possession of a Weapon in the Fourth Degree, and two counts of Tampering with Physical Evidence. Vidal asserts: (1) that his written and videotaped statements, made after he was given Miranda warnings, should have been suppressed because they were allegedly preceded by, and were the product of, hours of custodial interrogation without such warnings; and 2) that he was deprived of his due process right to a fair trial when, in the justification charge to the jury, the trial court included an instruction on the use of excessive force, where Vidal alleges there was insufficient evidence to find that excessive force was used, and where the trial court failed to include an instruction that Vidal could be convicted on the basis of excessive force only upon proof that the use of excessive force caused death. For the reasons stated below, Vidal's claims do not warrant habeas relief and his petition is denied.

BACKGROUND

   On the morning of April 15, 2002, Carmen Abergo ("Abergo") was observed working at a commercial building in Long Island City. Later that day, Vidal was observed at the same

1

building with bandages on his hands. Although Vidal worked for the same employer as Abergo, that day his assignment had been in Manhattan, and, thus, he had no employment-related reason for his presence at the Long Island City commercial building. Two days later, Abergo and Vidal's employer found Abergo's body in the basement of another commercial building he owned. Medical examiners determined that Abergo had died due to multiple chop and incise wounds to his head, neck and arms, inflicted by a sharp, heavy object. Medical examiners counted more than 129 separate injuries to Abergo's body, but could not determine which single injury had caused his death.

At approximately 4:00pm on April 19, 2002, police approached Vidal at his place of employment, and he voluntarily returned to the station house with the officers to be questioned in connection with Abergo's death. Vidal was not placed under arrest, and he continued to answer questions over the next eleven to twelve hours. At no point did Vidal explicitly ask to leave, nor did officers tell him he was required to stay at the police station. Early the next morning, at approximately 4:00am, an officer asked whether Vidal would tell him what happened to Abergo. Vidal responded that he would tell the truth. At that point, the officer read Vidal his <u>Miranda</u> rights. Vidal did not make any inculpatory statements prior to the <u>Miranda</u> warnings. Vidal then confessed to killing Abergo by hitting him several times with a machete. Vidal claimed that he was acting in self-defense, but he did not give an explanation for Abergo's alleged attack. Vidal made a written, signed statement of his confession. Afterward, police officers videotaped Vidal. The officers again read Vidal his <u>Miranda</u> rights, which he voluntarily waived. Vidal then gave a full, more detailed confession on video. He stated that Abergo had lured him into the basement with the promise of marijuana, but instead attacked him. He said that he disarmed Abergo, but then "lost control" and continued to repeatedly strike him with the machete. Vidal also led

police to the murder weapon and a bloody rag, which were hidden at his place of employment in Manhattan.

Vidal was charged with two counts of second degree murder, fourth degree criminal possession of a weapon, and three counts of tampering with evidence. Prior to trial, Vidal's motion to suppress both his written and video confessions was denied. Vidal was convicted of one count of second degree murder, fourth degree criminal possession of a weapon, and two counts of tampering with evidence. On June 1, 2005, Vidal was sentenced to concurrent terms of 25 years to life imprisonment for the murder conviction, one and one-third to four years imprisonment for the evidence tampering conviction, and one year of imprisonment for the weapon possession conviction.

On appeal to the New York State Supreme Court, Appellate Division, Vidal claimed: 1) that his confessions and the machete should be suppressed because his pre-Miranda interview was custodial in nature; and 2) that the trial court's excessive force jury charge was improper because there was insufficient evidence to find that excessive force was used, and because the trial court failed to include an instruction that Vidal could be convicted on the basis of excessive force only upon proof that the use of excessive force caused death. People v. Vidal, 44 A.D.3d 802, 802-03 (N.Y. App. Div. 2d Dep't 2007). In affirming the judgment, the Appellate Division held that Vidal's pre-Miranda interview was non-custodial in nature, and thus his suppression motion regarding his confessions and the machete was properly denied. Id. at 802. The Appellate Division concluded that Vidal's confessions were made intelligently and voluntarily. Id. Additionally, the Appellate Division found that Vidal's "contention regarding the Supreme Court's charge on the use of excessive force is unpreserved for appellate review[.]" Id. at 803.

3

Vidal sought leave to appeal to the New York Court of Appeals, but the Court of Appeals denied his application. People v. Vidal, 9 N.Y.3d 1010, at *1 (2007).

## DISCUSSION

### I. AEDPA Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). When a claim is adjudicated on the merits by the state courts, a federal habeas court will apply AEDPA deference. Where a state court finds a claim to be "unpreserved, and, in any event, without merit," that claim is deemed to have been reviewed on the merits. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). A state court need not enunciate a rationale for its decision in order to properly dispose of a claim on substantive grounds. Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002) (holding that claims had been "adjudicated on the merits" where the Appellate Division merely stated that "defendant's remaining contentions are without merit.").

The Supreme Court has said that "clearly established federal law" means "the holdings, as opposed to the dicta," of its decisions at the time of the state court adjudication. Williams v. Taylor, 529 U.S. 362, 412 (2000). A decision is contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or

4

if [it] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 412–13.

A decision involves an unreasonable application of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413. The "unreasonable application" phrase of § 2254(d)(1) means that "a state court decision must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is needed." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). The Second Circuit has cautioned "that the increment need not be great; otherwise, habeas relief would be limited to state court decisions so off the mark as to suggest judicial incompetence." Id. (internal quotation marks omitted).

## II. Suppression of Written and Videotaped Confessions

Vidal's first claim is that his confessions should have been suppressed because, although taken after Miranda warnings were given, they were preceded, and thus tainted, by hours of allegedly-custodial interrogation. Vidal claims that the lack of Miranda warnings during the first approximately twelve hours of his questioning tainted his post-Miranda testimony, rendering his confessions inadmissible. Vidal did not make any inculpatory statements prior to the Miranda warnings. The Appellate Division concluded that Vidal's pre-Miranda interview was not custodial in nature, and the confessions were properly admitted. Vidal, 44 A.D.3d at 802. The Appellate Division further held that Vidal's written and videotaped confessions were "voluntary, as they were made following his intelligent, voluntary, and knowing waiver of his Miranda rights[.]" Id. AEDPA deference applies to these conclusions.

Under Miranda, an accused must be adequately informed of his constitutional rights prior to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 464-67 (1966). "[F]ailure to give

5

the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004). However, in Oregon v. Elstad, 470 U.S. 298 (1985), the Supreme Court held that an accused who answered questions before receiving Miranda warnings was not necessarily "disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318. Under Elstad, such statements are generally admissible where the post-warning statement is itself voluntary. Id.

In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court recognized an exception to Elstad, "for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007). In all other cases, "the holding in Elstad applies." Id. "[A] court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." United States v. Capers, 627 F.3d 470, 479 (2d Cir. 2010). Objective factors to consider in reviewing whether a Miranda waiver given after an initial round of questioning is effective include, "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615 (plurality); see also Carter, 489 F.3d at 536.

To the extent that Seibert is even applicable to an interrogation where the suspect did not make any incriminating statements before he was read his Miranda rights,[1] reviewing the totality

---

[1] But see United States v. Ferguson, No. 10 Cr. 843(LTS), 2011 WL 1347002, at *7 (S.D.N.Y. April 4, 2011) ("Because the initial non-Mirandized questioning of Ferguson was not illegal, it is unnecessary for the Court to

6

of the objective and subjective evidence, there is no indication that the officers adopted a deliberate two-step strategy to obtain the postwarning confession. No inculpatory statements were made during petitioner's interrogation prior to his being warned. Detectives gave petitioner his Miranda warnings immediately after the petitioner informed them that he would tell them what really happened.[2] There is no evidence of relevant overlap between the pre- and post-warning interviews, and, thus, unlike in Seibert, the interposition of petitioner's Miranda warnings would effectively advise the petitioner that he had a real choice about giving an admissible statement. 542 U.S. at 612; see also McMillon v. Culley, 380 Fed. Appx. 63, 66-67 (2d Cir. 2010) (finding officers who did not first obtain confession did not engage in two-step process under Seibert). Accordingly, the Court finds that a deliberate two-step process like the one in Seibert was not applied. As petitioner does not dispute that his post-Miranda statements were voluntary and that the Miranda warnings were complete – and there is no evidence in the record to suggest otherwise – the Court finds the statements admissible under Elstad.

Moreover, the state court is entitled to AEDPA deference with respect to its conclusion that petitioner was not in custody prior to the issuance of his Miranda warning. Custody "is determined by ascertaining whether that individual is 'subjected to restraints comparable to those associated with a formal arrest.'" Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009) (quoting Berkemer v. McCarty, 468 U.S. 420, 441 (1984)). "The ultimate question is how a reasonable man in the suspect's position would have understood his situation." Id. (internal quotation marks omitted). Due to the fact-specific nature of a Miranda claim, "unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application

---

address the defense's further arguments as to whether there was improper 'two-step' questioning that would preclude the admission of his additional, post-Miranda statements to authorities.").
[2] Petitioner's statement that he would tell the detectives what really happened was not self-incriminating. See Nova v. Bartlett, 211 F.3d 705, 708 (2d Cir. 2000) (finding the statement, "I'll tell you the truth," was not incriminating).

7

of clearly established Federal law in concluding that custody for Miranda purposes was not shown." Cruz v. Miller, 255 F.3d 77, 86-87 (2d Cir. 2001). Vidal went to the precinct voluntarily, and although he was certainly present at the police station for an extended period of time, he did not explicitly ask to leave at any point. Nor did police tell him that he was required to stay and answer their questions. Although "some of the circumstances admittedly point toward custody[,]" the Appellate Division's holding was not an unreasonable application of, or contrary to, clearly established Supreme Court law. See Cruz, 255 F.3d at 87. Vidal's first claim fails to provide the basis for federal habeas relief.

### III. Excessive Force Jury Instruction

Vidal claims that the trial court deprived him of his due process right to a fair trial when it instructed the jury to consider the issue of excessive force in determining petitioner's justification defense. Respondent contends that Vidal's claim is procedurally barred because the Appellate Division relied on an independent and adequate state ground—the contemporaneous objection rule codified in N.Y. CPL §470.05[2]. This Court agrees, and as Vidal has not asserted sufficient grounds to overcome the procedural default, finds that federal habeas relief cannot be granted based on this claim. Even if the claim were not procedurally barred, the Court finds that it is without merit.

*a. Procedural Bar*

The Appellate Division held that petitioner's claim regarding the trial court's charge on the use of excessive force was "unpreserved for appellate review[.]" Vidal, 44 A.D.3d at 803 (citing New York Criminal Procedure Law ("CPL") § 470.05[2]). Where a state court rejects a claim based on the petitioner's failure to comply with a state procedural rule, the procedural default may constitute an independent and adequate ground for the state court's decision, thus

barring appellate review. See Coleman v. Thompson, 501 U.S. 722, 729-30, 749-50 (1991). A determination that a claim is unpreserved is a sufficient indication that the state court denied the claim based on state procedural grounds. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

Under the New York contemporaneous objection rule codified in N.Y. CPL § 470.05[2], appellate review of a trial court ruling is precluded unless an objection was made to the ruling "by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. CPL § 470.05[2]. The Second Circuit has held that failure to comply with the contemporaneous objection rule is an adequate and independent bar to federal habeas review. See Whitley v. Ercole, 10–3119–pr., 2011 WL 2184287, at *9-*13 (June 7, 2011); Gonzalez v. Cunningham, 670 F. Supp. 2d 254, 261 (S.D.N.Y. 2009) (citing Richardson v. Greene, 497 F.3d 212, 218 (2d Cir. 2007); Felder v. Goord, 564 F. Supp. 2d 201, 223 (S.D.N.Y. 2008)); see also Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir. 1994); Fernandez v. Leonardo, 931 F.2d 214, 216 (2d Cir. 1991); Peterson v. Scully, 896 F.2d 661, 663 (2d Cir. 1990).

Although "novelty or sporadic application" may render a state procedural rule inadequate to create a procedural default precluding federal habeas review, the Second Circuit has regularly "observed and deferred to New York's consistent application of its contemporaneous objection rules." Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999); see also Whitley, 2011 WL 2184287, at *7; Richardson, 497 F.3d at 218. "Accordingly, New York's contemporaneous objection rule is not rendered 'inadequate' on account of novelty or sporadic application, as sometimes is the case." Garcia, 188 F.3d at 79 (citing NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457-58 (1958); Williams v. Lane, 826 F.2d 654, 659 (7th Cir. 1987)).

Where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Harris v. Reed, 489 U.S. 255, 262 (1989).

To show cause for a procedural default, petitioner must demonstrate "some external impediment preventing counsel from constructing or raising the claim." Murray v. Carrier, 477 U.S. 478, 492 (1986). Petitioner has stated no such cause for his default and none is apparent from the trial transcript. Without cause for the default, prejudice is immaterial. See Brennan v. United States, 867 F.2d 111, 119 (2d Cir. 1989) ("We need not consider the issue of 'prejudice,' because Brennan has failed to show any 'cause' excusing his procedural default.").

Likewise, a procedural bar may be overcome by a showing that a fundamental miscarriage of justice would occur were this court to decline to consider petitioner's claim. Coleman, 501 U.S. at 750. This is an extremely high bar for petitioner to meet, as it is "tied . . . to the petitioner's innocence." Schlup v. Delo, 513 U.S. 298, 321 (1995). To overcome a procedural default, a claim of actual innocence, "must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House v. Bell, 547 U.S. 518, 536-37 (2006) (citation omitted). Such a claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 537 (citation omitted). As Vidal has not put forth any new evidence supporting a claim of actual

innocence either here or in the Appellate Division, he cannot meet the standard required to show a fundamental miscarriage of justice.

Accordingly, the consistently-applied New York contemporaneous objection rule is an adequate bar to federal habeas review in Vidal's case. As federal habeas review of this claim is procedurally barred, Vidal is not entitled to federal habeas relief based on this claim.

*b. Merits*

Even if the Court were to consider Vidal's claim regarding the excessive force instruction on the merits, Vidal has not established his entitlement to habeas relief. It is now well-settled law that an improper jury charge alone does not necessarily amount to a due process violation. Thus, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Instead, the Court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id. at 73. The allegedly erroneous instruction must "so infect[] the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). This occurs when the instruction was "sufficiently harmful to make the conviction unfair." Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001); see also Duckett v. Godinez, 67 F.3d 734, 746 (9th Cir.1995) (asking whether trial court's refusal to give requested instruction rendered the trial "fundamentally unfair"); Means v. Solem, 646 F.2d 322, 332 (8th Cir.1980) (granting habeas relief where trial court's refusal to instruct the jury on self-defense was an error of "constitutional magnitude"). The jury instruction "must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 73. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

11

Where an instruction has the effect of denying a defendant a "highly credible defense," such an instruction may violate due process. Davis, 270 F.3d at 131. Thus, courts have found that the failure to charge the jury on justification may constitute a due process violation. See, e.g., Jackson v. Edwards, 404 F.3d 612, 625 (2d Cir. 2005); Davis, 27 F.3d at 131-32. Even if a defense may be raised under state law, however, failure to instruct is not a due process violation where that defense is, "a fantastic, improbable defense that the jury was unlikely to adopt," Davis, 270 F.3d at 132 (citing Blazic v. Henderson, 900 F.2d 534, 541-43 (2d Cir. 1990), or where "the absence of an instruction" is "mitigated by other portions of the charge." Id. (citing Henderson v. Kibbe, 431 U.S. 145, 156-57 (1977)).

Here, the trial court instructed the jury on justification. Petitioner, however, objects to a portion of that instruction, in which the trial judge charged the jury as follows:

> In addition, there is evidence in this case that after Carmen Abergo was disarmed and incapacitated the defendant continued to use deadly physical force upon him. Even if you find that Mr. Vidal was initially justified in using deadly physical force defensively against Mr. Abergo, the law permits him to do so only to the extent he reasonably believed such force to be necessary to defend himself. If the evidence convinces you beyond a reasonable doubt that at some point in his encounter with Carmen Abergo the defendant continued to use deadly physical force when he no longer believed that such force was necessary to defend himself, you may find that he was no longer acting in self-defense and you may find him guilty of such crimes as the evidence establishes he committed.
>
> Thus, you as the finders of fact are required to apply the same standard of reasonableness to the issue of the degree of force allegedly used by Mr. Vidal in this case. It is for you to determine based upon all of the facts and circumstances as you find they were known to Mr. Vidal at the time of his encounter with Carmen Abergo whether Mr. Vidal honestly believed the degree of force he used was warranted and necessary to defend himself from the use or imminent use of deadly physical force by Carmen Abergo. And whether under all of the circumstances as they existed at the time a reasonable person would also have believed that that degree of force was necessary.

(Tr. 609-10.) Petitioner argues that the instruction had the effect of denying him his defense of justification.

12

The Court concludes that, on the facts of this case, including an excessive force instruction as part of the trial court's justification charge was not itself a violation of due process. "Justification is a defense only to the use of such force as is reasonably believed necessary to repel the threat." People v. Brathwaite, 276 A.D.2d 707, 707, 714 N.Y.S.2d 754, 755 (2d Dep't, 2000); see also N.Y. Penal Law § 35.15; Matter of Y.K., 87 N.Y.2d 430, 433 (1996). According to Vidal's brief in his state court appeal, Vidal first hit Abergo with a machete in the elbow, which he then dropped to the floor:

> The two men then struggled on the floor for possession of the machete, with [petitioner] prevailing. When Abergo still appeared to be looking for something, appellant, again losing control, got up and hit him two to three times on the head with the machete.

(Def. Br. App. Div. 9-10.) Petitioner, therefore, had prevailed in seizing the only known weapon from Abergo, at which point he, "lost control," and struck Abergo in the head.

At trial, Medical Examiner Lara Goldfeder, who performed an autopsy on Abergo, testified that Abergo had suffered more than 129 separate injuries. (Tr. 420.) The most severe were described as "chop wounds." (Tr. 421.) There were two large chop wounds in Abergo's head, one that penetrated the top of his head and continued for five inches down through the forehead, causing a four-inch fracture of his skull and slicing the brain, and the other a four-inch cut over his left ear. The medical examiner also observed a wide gaping wound caused by a cluster of chop wounds, running from the top of Abergo's neck, on the left side, six and one-half inches along the jaw below the left ear, and involving multiple fractures of both the left jaw and the top of the spinal column near the back of the neck. (Tr. 426-27.) The medical examiner testified that these chop wounds, which extended into the vertebrae at the top of the neck, were caused by at least three or four blows. (Tr. 427.) Under the circumstances, an unreasonable force jury charge was entirely appropriate.

13

Petitioner argues that even if an excessive force charge was proper, the charge should have contained an instruction that the jury could convict petitioner of murder on the ground that he used excessive force only if they also found that the excessive force caused death. Under New York law, where there is medical evidence of a specific, fatal wound, "the People must prove that it was the excessive force which caused death." People v. Carrera, 282 A.D.2d 614, 615, 725 N.Y.S.2d 344, 346 (2d Dep't 2001). However, in People v. Darden, 57 A.D.3d 1522, 871 N.Y.S.2d 522 (4th Dep't 2008), the court rejected an argument similar to that raised by petitioner in this case. In Darden, the victim sustained three gunshot wounds. Defendant argued that the first two shots were justified as self-defense, and that the third shot was justified because it was either not fatal or the victim had already died. The court rejected defendant's argument that a jury instruction clarifying the application of the excessive force doctrine was required, "because there was no evidence that there was a single fatal gunshot. Rather, the medical evidence established that the victim died as a result of multiple gunshot wounds and that it could not be determined in which order the wounds were sustained." Id. at 1523, 871 N.Y.S.2d 522, 523.

Here, the medical examiner testified that Abergo died as a result of "multiple chop and incise wounds of the head, neck and upper extremities." (Tr. 440.) She testified that she could not conclude, based on the medical evidence, which wounds were inflicted first (tr. 462), or what "ultimately caused [Abergo's] death." (Tr. 452.) According to petitioner's own version of events, Abergo was alive after petitioner initial struck Abergo's elbow, at which point, after a struggle, petitioner disarmed Abergo and struck him in the head with the machete two or three times. (Def. Br. App. Div. 9-10.) Abergo was still alive when petitioner left him in the basement, and Abergo was even alive when petitioner returned to the basement later that day.

14

(Def. Br. App. Div. 10.) The jury, therefore, was highly unlikely to conclude that the allegedly excessive force did not itself cause Abergo's death.

Moreover, although there is no causation language in the excessive force charge itself, both the second degree murder charge and the first degree manslaughter make clear that it was the people's burden, with respect to both of those crimes, to prove that "Vidal caused the death of Carmen Abergo by striking him multiple times with a machete." (Tr. 613, 616.) Accordingly, the Court finds that petitioner's due process rights were not violated by the trial court's failure to instruct the jury that it could convict petitioner of murder on the ground that he used excessive force only if they also found that the excessive force caused death. Thus, even if Vidal's claim was not procedurally barred, he is not entitled to federal habeas relief based on this claim.

## CONCLUSION

For the reasons stated, the petition for a writ of habeas corpus is denied. Since Vidal has failed to make a "substantial showing of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C. § 2253(c). The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, N.Y.
June 27, 2010

/S/
Carol Bagley Amon
United Stated District Judge